IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

WANDA DIANE CONARY,

      Plaintiff,

v.                                  Case No.: 2:18-cv-01228

NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,

      Defendant.

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 12, 13).

For the following reasons, the undersigned **RECOMMENDS** that the Court **GRANT** Plaintiff's motion for judgment on the pleadings to the extent that it requests

remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g); **DENY** Defendant's request to affirm the decision of the Commissioner; **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this case, **with prejudice**, and remove it from the docket of the Court.

I.    **Procedural History**

On December 27, 2014 and November 20, 2015, Plaintiff Wanda Diane Conary ("Claimant"), protectively filed applications for DIB and SSI, respectively, alleging a disability onset date of July 1, 2014 due to "degenerative disc disease; osteoarthritis; compressed, bulging disc spurs L3-L5; fibromyalgia; and Lyme disease." (Tr. at 168-75, 189). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 17). Claimant then filed a request for an administrative hearing, which was held on April 21, 2017 before the Honorable David Read, Administrative Law Judge. (Tr. at 33-68). By written decision dated June 12, 2017, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 14-32). The ALJ's decision became the final decision of the Commissioner on January 30, 2018 when the Appeals Council denied Claimant's request for review. (Tr. 6-10).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision to which Claimant filed a reply. (ECF Nos. 12, 13, 16). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 55 years old on her alleged onset date and 58 years old on the date of the ALJ's decision. (Tr. at 172). Claimant graduated from high school and served in the United States Navy. (Tr. at 190). She previously worked as a loan processor and administrative assistant. (Tr. at 54, 191).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his  or her findings. Second, the ALJ rates and documents the degree of functional limitation

4

resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2018. (Tr. at 19, Finding

5

No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 1, 2014, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: degenerative disc disorder, major depressive disorder, and posttraumatic stress disorder. (Tr. at 19-20, Finding No. 3). The ALJ considered Claimant's substance use, but found the impairment to be non-severe. The ALJ also considered Claimant's chronic bilateral leg pain and fibromyalgia and concluded that they were not medically determinable impairments. (*Id.*).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 20-22, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she is able to lift/carry 30 pounds occasionally, 20 pounds frequently. She is able to sit six hours in an eight-hour workday, stand six hours in an eight-hour workday, and walk six hours in an eight-hour workday. She is able to climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl occasionally. She is limited to frequent interaction with supervisors, co-workers, and the public. The claimant will be off task five percent of the time in an eight-hour workday.

(Tr. at 22-26, Finding No. 5).

At the fourth step, with the assistance of a vocational expert, the ALJ determined that Claimant was able to perform her past relevant work as a loan processor and administrative assistant, as she actually performed the jobs and as they are generally performed. (Tr. at 26-27, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 27, Finding No. 7).

## IV.   Claimant's Challenge to the Commissioner's Decision

Claimant raises two challenges to the Commissioner's decision, both of which concern the ALJ's RFC assessment. First, she argues that the ALJ failed to explain or provide any evidentiary support for his assessment that Claimant would be off task for five percent of the workday. (ECF No. 12 at 7-8). Claimant contends that because the ALJ did not cite to any evidence, gave only "some weight" to the sole psychological opinion in the record, and did not order a consultative examination, the five percent off-task limitation "could only have risen from his own unqualified lay opinion." (*Id*. at 9). Claimant cites a recent case, *Carter v. Berryhill*, No. 2:17-CV-04399, 2018 WL 4169108 (S.D.W. Va. Aug. 30, 2018), in which the Court remanded the Commissioner's decision because the ALJ did not build a logical bridge between the evidence and an assessed off-task limitation. (*Id*.). Claimant further argues that the ALJ's error was not harmless in this case because the vocational expert testified at Claimant's administrative hearing that while someone who was off task five percent of the workday could perform Claimant's past work, a person with moderate limitations in the functional domain of concentration, persistence, or pace could not perform such work. (*Id*. at 10). Therefore, Claimant asserts that the five percent off-task limitation was critical to the ALJ's step four determination that Claimant could perform her past relevant work, and the ALJ's failure to explain the finding precludes meaningful review by this court and necessitates remand. (*Id*.).

Claimant's second challenge to the Commissioner's decision concerns the ALJ's alleged failure to account in the RFC finding for his assessment that Claimant had moderate difficulty interacting with others. (*Id*. at 10). Claimant compares the instant matter to the United States Court of Appeals for the Fourth Circuit's decision in *Mascio*

*v. Colvin*, 780 F.3d 632 (4th Cir. 2015), which held that since the ALJ found the claimant to have moderate limitations in maintaining concentration, persistence, or pace, the ALJ was obligated to either assess RFC restrictions related to the moderate functional impairment, or explain why further restrictions were not necessary. (*Id.* at 12). Claimant argues that the ALJ's conclusion that Claimant could interact with others frequently (up to two-thirds of the workday) was inconsistent with the ALJ's finding that Claimant was moderately limited in maintaining concentration, persistence, or pace, and the ALJ did not explain why stricter limitations were not appropriate. (*Id.* at 12-13). Furthermore, Claimant notes that none of the daily activities cited by the ALJ would have required Claimant to have frequent contact with the public. She points to Listing 12.00F(3)(c), which explains that a claimant's ability to use an area of mental functioning at home or in her community does not necessarily carry over to the work setting, where the demands and stressors are different. (*Id.* at 13). Finally, Claimant argues that the ALJ's error in assessing this functional domain is not harmless because it affected her ability to return to her past work. Claimant contends that if she could not return to her past work, she would have been deemed disabled under Medical-Vocational Rule 202.06 given her age and other factors. (*Id.* at 14).

In response to Claimant's challenges, the Commissioner argues that Claimant did not even mention mental health impairments in her initial disability application. (ECF No. 13 at 1). The Commissioner discusses that Claimant continued to maintain a variety of activities, and, although she had some mental health treatment beginning in October 2014, her providers never noted the extreme limitations that she alleges. (*Id.*). The Commissioner contends that the ALJ "exhaustively evaluated" Claimant's testimony and the medical evidence in fashioning the RFC assessment, and the decision is well-

explained and supported by substantial evidence. (*Id*. at 10). The Commissioner asserts that the ALJ's analysis of the evidence provided a clear logical bridge to his conclusion that Claimant would be off task more than the state agency expert found, but less than Claimant alleged. (*Id*. at 13). The Commissioner distinguishes *Carter*, stating that Claimant's mental symptoms alone were the source of her being off task, whereas the issue in *Carter* was that the ALJ did not differentiate between various conditions that caused the claimant to be off task, and the evidence potentially supported a greater limitation than the ALJ assessed. (*Id*. at 13). Regarding Claimant's second challenge, the ALJ contends that *Mascio* did not concern the functional domain of social functioning; thus, the holding does not apply to Claimant's case. (*Id*. at 15). Further, according to the Commissioner, the ALJ specifically accounted for Claimant's social functioning limitations by limiting her to frequent contact with others. (*Id*.).

Claimant filed a reply to the Commissioner's brief, noting that the Commissioner focuses on undermining the severity of Claimant's mental impairments, which is not the issue before the Court as the ALJ found that the mental impairments to be severe. (ECF No. 16 at 1). Rather, according to Claimant, the issue is that the ALJ did not lay a proper foundation for the five percent off-task limitation that the ALJ assessed in the RFC. (*Id*. at 1-2). Further, Claimant argues that despite the Commissioner's post hoc explanation, the assessed off-task limitation was arbitrary and not apparent from the ALJ's discussion of the evidence. (*Id*. at 3-4). Finally, Claimant states that the Commissioner, like the ALJ, cites to daily activities that are unrelated to Claimant's ability to interact with others at work, and the Commissioner makes no effort to explain how Claimant's daily activities contradicted her statements that the ALJ accepted regarding her disinclination to deal with the public and have anger outbursts. (*Id*. at 4-5).

V.    <u>**Relevant Evidence**</u>

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

**A. Treatment Records**

On July 24, 2014, Claimant saw neurologist Arshad Iqbal, M.D., regarding confusion and overall sluggishness in addition to physical issues. (Tr. at 316). Dr. Iqbal did a lumbar puncture to rule out central nervous system Lyme disease, but the results were negative. (Tr. at 311, 316).

On February 27, 2015, Claimant reported to her primary care provider that she was assaulted by her husband four days earlier and had obtained a "no contact" order. (Tr. at 495). Claimant complained of increased anxiety since the incident and received a prescription for Lorazepam. (Tr. at 497). It was documented that Claimant had a history of depression for which she was already taking Cymbalta. (Tr. at 495).

On March 19, 2015, Claimant returned to her primary care provider to request a medication adjustment to manage her worsening depression since her husband assaulted her, turned off the utilities, and cleared out their bank account. (Tr. at 498). Claimant was sad and crying throughout the appointment, but her attention span was normal. (Tr. at 500-01). Wellbutrin was added to her medication regimen, which already included Cymbalta and Lorazepam. (Tr. at 501).

The following month, on April 10, 2015, Claimant reported to her primary care provider that she was feeling much better. (Tr. at 502). She was served with divorce papers and was "very excited about" it. (*Id*.). Her mental status was normal and she was continued on medications. (Tr. at 504-05).

However, on May 8, 2015, Claimant was voluntarily admitted to St. Joseph Hospital for six days of in-patient psychiatric treatment after she overdosed on 18 Lorazepam tablets. (Tr. at 389). Claimant reported that she had a history of depression during her 25-year marriage. (*Id.*). She was extremely depressed, particularly in the past two months after she and her husband fought in February and he physically assaulted her. (Tr. at 389, 397). A restraining order was placed against her husband, so he moved out of their home. (*Id.*). Nevertheless, Claimant expressed that she missed her husband and wished for him to return home, but he disagreed and wanted to move forward with their pending divorce. (Tr. at 390). At the time of her discharge on May 14, 2015, Claimant was pleasant, cooperative, and articulate, and her attention, concentration, and memory were noted to be good. (*Id.*). In addition, Claimant's mood was almost euthymic, and her affect was congruent. (*Id.*). Claimant was diagnosed with major depression and delirium secondary to Lorazepam overdose and was prescribed psychiatric medications. (*Id.*).

Later that year, on December 15, 2015, Claimant presented to Charleston Area Medical Center ("CAMC") Outpatient Care Center for depression, back pain, and migraines. (Tr. at 438). Claimant reported that her depression was associated with her chronic pain and headaches. (*Id.*). She was continued on Cymbalta, Wellbutrin, and Olanzapine for her depression with psychosis. (Tr. at 442).

On March 14, 2016, Claimant was referred to Prestera Center for treatment of depression. (Tr. at 412). During her initial intake evaluation, Claimant expressed that she was very stressed in her prior job as a loan processor, causing her to have to go outside and walk around the plaza during work to calm down. (Tr. at 414). She stated that the cause of the "meltdown" was usually something someone said to her at work

and that when she became anxious, she would raise her voice. (*Id*.). Claimant reported that her daily activities included doing a lot of crafts, sewing, and helping care for her parents, who were in their nineties. (*Id*.). On examination, Claimant's attention/concentration was distractible, but her memory was intact and her general behavior was appropriate and cooperative. (Tr. at 417). Claimant was referred for individual therapy with a licensed social worker. (Tr. at 415).

On March 15, 2016, Claimant presented to CAMC Outpatient Care Center for back pain, GERD, and depression. (Tr. at 432). Her depression was again noted to be associated with her chronic pain. (*Id*.). She was advised to follow up with Prestera Center for mental health treatment. (Tr. at 436). Thus, over the next several months, Claimant participated in outpatient individual therapy sessions at Prestera Center. Her attention/concentration was fair during her appointments on March 28; April 4 and 18; May 2, 16, 23, 2016; and August 25, 2016; however, she was noted to be "easily distractible" during her visits on April 13 and 25, July 28, and August 11, 2016. (Tr. at 420, 423, 425, 428, 453, 456, 459, 462, 465, 468, 471). Claimant was cooperative with the therapist at all of her appointments. (*Id*.).

On January 3, 2017, Claimant had a regular follow-up appointment with her primary care physician. She mentioned that her depression was worse, but believed it was due to the holidays as they caused her to remember her ex-husband. (Tr. at 534). Claimant's dosage of Trazodone was increased and she was again referred for therapy. (Tr. at 535). She was also continued on Cymbalta, Wellbutrin, and Olanzapine for her mental conditions. (*Id*.).

On January 24, 2017, Claimant presented to CAMC Memorial Hospital Outpatient Care Center for right knee pain after a piece of wood struck her knee when

she was chopping wood. (Tr. at 523). In terms of depression, Claimant reported having more "good days than bad," and she was tolerating her medications well. (*Id*.). Claimant's depression was stable. She was taking bupropion, Zyprexa, and Cymbalta. (Tr. at 523-24).

Yet, on April 11, 2017, Claimant told her primary care provider that she was feeling more depressed over the past two months. (Tr. at 558). She tried to "put up a face," but had trouble getting out of bed. (*Id*.). Claimant's dosage of Zyprexa was increased and she was continued on Cymbalta, Wellbutrin, and Trazodone. (Tr. at 559).

### B. Opinion Evidence

On June 17, 2015, state agency psychologist, J. Stephen Clifford, Ph.D., performed a psychiatric review technique based upon his analysis of Claimant's records. Dr. Clifford opined that Claimant had affective disorders that were severe impairments. (Tr. at 92). He assessed that Claimant was moderately limited in maintaining concentration, persistence, or pace and had one or two episodes of decompensation of extended duration, but stated that Claimant's impairments otherwise posed no more than mild limitations. (Tr. at 93). Dr. Clifford noted that Claimant was admitted for in-patient treatment in May 2015. Although her attention, concentration, and memory were described as good shortly after her admission, she had psychomotor slowing that would have caused a brief interference with work schedule and attendance and some slowing of work pace. (Tr. at 96). However, Dr. Clifford felt that Claimant could typically complete a normal workday and workweek and she had no social interaction limitations.

### C. Claimant's Statements

On July 15, 2015, Claimant completed an Adult Function Report. In terms of daily activities, Claimant stated that she cared for cats, prepared meals, did small loads of

laundry and light housework, drove, and went shopping weekly. (Tr. at 221-24). She could pay bills, count change, handle a savings account, and use a checkbook/money orders. She maintained hobbies such as weaving, sewing, and doing crafts. (Tr. at 224-25). Claimant stated that she had issues completing tasks and getting along with others, but that she did not have trouble concentrating. (Tr. at 226). She noted that she could pay attention for 20 minutes, and, although she followed instructions well, she did not finish what she started. (*Id.*). In addition, Claimant stated that due to severe clinical depression, she was agoraphobic and tended to stay home. (*Id.*). She claimed that she had trouble getting along with others, but not authority figures. (Tr. at 226-27). Finally, she stated that she did not handle stress well and that changes in routine, in her words, messed her up. (Tr. at 227).

Claimant testified at her administrative hearing on April 21, 2017 that she "had a hard time with" customer service in her past work as a commercial loan administrator. (Tr. at 39-40). Claimant stated that she could no longer work because, in addition to issues with her spine, she "lost her ability to deal with the public" because she tended to become irritated very quickly and would sometimes "blow off steam," which was not permissible. (Tr. at 42). Claimant also stated that she was fired from her job as a loan administrator in 2013 because she "had a couple of episodes" in which she became angry and went outside "for, like, an hour trying to calm down." (Tr. at 42). She did not interact with the public in that job, but she dealt with co-workers and would become upset when her suggestions for improving the job were not accepted. (Tr. at 43-44). She explained that she "was having a lot of emotional issues" at that time. (Tr. at 44). Claimant further testified that she would become confused when working as a loan administrator, stating that she "lost" her ability to concentrate and it was getting worse. (Tr. at 48, 63). It was

14

hard for her to pay attention at work and she would sometimes have to stay late to finish tasks that she could not get accomplished during the day because she became so sidetracked. (Tr. at 64).

Claimant testified at her hearing that she still took Cymbalta, Trazadone, and Olanzapine for depression. (Tr. at 45-46). Claimant believed that events related to the deterioration of her marriage had a severe impact on her mental health. She was diagnosed with post-traumatic stress disorder and tried to avoid people, because she became aggravated very easily. (Tr. at 46-47). As hobbies, Claimant turned vases into candle holders, sewed, and hand weaved birthday gifts for her sisters. (Tr. at 51).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is

supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   **Discussion**

Claimant's challenges to the Commissioner's decision concern the ALJ's RFC assessment. In particular, Claimant challenges the ALJ's assessment that Claimant would be off task for no more than five percent of the workday and could frequently interact with supervisors, co-workers, and the public. Claimant argues that the ALJ's lack of explanation or support for the foregoing limitations renders the decision incapable of meaningful review. Furthermore, Claimant contends that the errors cannot be considered harmless, because the ALJ's RFC conclusions regarding her ability to remain on task and interact with others in the workplace directly impacted the step four determination that she could return to her past relevant work as an administrative assistant and loan processor.

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the most that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.*

According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to

16

do work-related activities." *Id.* at *3. The functions that the ALJ should assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR §§ 404.1545(b-d), 416.945(b-d). As the regulations explain, a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [the claimant's] ability to do past work and other work." 20 C.F.R. §§ 404.1545(c), 416.945(c).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities

in the evidence in the case record were considered and resolved." *Id.* at *7. As the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") recently emphasized, "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), *as amended* (Feb. 22, 2019) (citations omitted). Critically, the "second component, the ALJ's logical explanation, is just as important as the other two." *Id.* Indeed, Fourth Circuit "precedent makes clear that meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Id.*

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

### A.    *Off-Task Limitation*

Claimant asserts that the ALJ failed to explain or cite to any evidence to support the RFC assessment that Claimant would be off task for five percent of the workday. Claimant explains that the determination regarding her ability to remain on task was critical to the ALJ's step four conclusion that she could return to her past relevant work; particularly, as the vocational expert testified that, although a person could perform Claimant's past relevant work while being off task for five percent of the workday, a moderate limitation in concentration, persistence, or pace would preclude an individual from performing Claimant's past relevant work.

In this case, the ALJ concluded at step two of the sequential evaluation that Claimant had three severe impairments: degenerative disc disease, major depressive disorder, and posttraumatic stress disorder. (Tr. at 19). The ALJ applied the special technique to assess the degree of functional limitations resulting from Claimant's mental impairments. (Tr. at 21). The ALJ noted that Claimant stated that she could only pay attention for 20 minutes and had difficulty completing tasks, but she could pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*). In addition, the ALJ cited that Claimant's treatment records reflected that her attention/concentration was fair. (*Id.*). The ALJ agreed with the state agency psychologist's opinion that Claimant's concentration was moderately limited. (Tr. at 21-22). Therefore, the ALJ concluded that Claimant was moderately limited in maintaining concentration, persistence, or pace. (*Id.*).

In proceeding with the sequential evaluation, the ALJ stated that the RFC finding reflected the degree of limitation found in the foregoing paragraph B mental function analysis. (Tr. at 22). The ALJ again noted Claimant's statement that she had difficulty concentrating, but did not find Claimant's allegations to be entirely consistent with the evidence. (Tr. at 23). The ALJ posited that Claimant's daily activities were not as limited as one would expect given Claimant's alleged disabling symptoms, adding that Claimant performed personal care without difficulty, prepared meals four times per week, did small loads of laundry, performed light cleaning, shopped in stores weekly, completed yard work, did crafts, practiced yoga, took care of neighborhood cats, cut wood, and helped care for her elderly parents. (Tr. at 24). The ALJ then discussed Claimant's treatment records, noting that Claimant began complaining of confusion and sluggishness in 2014, but her attention span and associations were normal in early 2015,

her attention and concentration were good in May 2015, and her attention and concentration were fair seven months later. (Tr. at 24-25). The ALJ stated that he gave partial weight to the non-examining state agency psychologist's opinion by agreeing with the finding that Claimant had moderate limitation in concentration, persistence, or pace, but disagreeing that Claimant could complete a normal workday and workweek with no limitations. (Tr. at 26). The ALJ then summarily concluded that "the record (including the hearing testimony discussing the claimant's work record) better support[ed] a finding" that Claimant was off task no more than five percent of a workday. (*Id.*).

Upon review of the ALJ's decision, the undersigned agrees that the ALJ did not provide sufficient explanation or support for his RFC assessment that Claimant would be off task for five percent of the workday. Indeed, the ALJ did not provide any meaningful analysis of Claimant's ability to remain on task. While the ALJ discussed Claimant's physical impairments, pain, and mental impairments, he did not articulate which impairments or symptoms caused Claimant to be off task, much less did the ALJ provide a basis for the specific assessment that Claimant would be off task for no more than five percent of the workday. Rather, the ALJ erroneously proceeded straight from his discussion of the medical record to the off task limitation without building any logical bridge from evidence to conclusion. *Thomas*, 916 F.3d at 311; SSR 96-8p.

Moreover, the assessment that Claimant would be off task for five percent of the workday is not reflected in any treatment note, medical opinion, or in Claimant's statements such that the ALJ's reasoning can be gleaned from the record. To the contrary, the evidence was contradictory on that point and none of it corresponded to the ALJ's finding. As the ALJ cited, Claimant stated that she could only pay attention for

20 minutes and had trouble completing tasks. The state agency psychologist, who reviewed the evidence, found that Claimant was moderately limited in maintaining concentration, persistence, or pace, yet opined, without further explanation, that Claimant could typically complete a workday and workweek with no mental limitations. The ALJ ultimately did not give full credence to any of the foregoing evidence, stating instead that the evidence of record better supported a finding that Claimant was off task no more than five percent of the workday. (Tr. at 26).

While an ALJ is not obligated to base each conclusion in the RFC assessment on a specific piece of evidence, an ALJ must *consider* all relevant evidence in the record and arrive at a determination of a claimant's RFC that is supported by substantial evidence. *Fruit v. Colvin*, No. 2:14-CV-07643, 2015 WL 1021309, at *22 (S.D.W. Va. Mar. 9, 2015); 20 C.F.R. § 404.1545(a)(1); SSR 96–8p, 1996 WL 374184, at *5. In performing that task, the ALJ must also reconcile conflicting evidence. Here, the ALJ reviewed Claimant's daily activities, finding them not to be as limited as one would expect given Claimant's alleged disabling symptoms. The ALJ further mentioned that Claimant's attention and concentration were noted to be "normal" and "good" during clinical visits in 2015 and "fair" during an appointment the following year. Finally, the ALJ referenced that the state agency consultant did not assess any mental RFC limitations. However, notwithstanding this purportedly benign evidence, the ALJ found Claimant to have moderate impairments and included a five percent off-task limitation in the RFC finding. Without knowing the ALJ's analysis of Claimant's functional abilities and the basis for the RFC conclusion, the Court cannot determine whether it is supported by substantial evidence. *See, e.g., Fisher v. Comm'r, Soc. Sec.*, No. RDB-17-3165, 2018 WL 3348858, at *3 (D. Md. July 9, 2018), *report and recommendation adopted,* 2018 WL

5309788 (D. Md. Aug. 1, 2018) (recommending remand where the ALJ did not provide any explanation or support for the "extremely specific conclusion" in the RFC assessment as to how often and how long the claimant needed breaks due to being off task); *Carter v. Berryhill*, No. 2:17-CV-04399, 2018 WL 4381275, at *12 (S.D.W. Va. Apr. 11, 2018), *report and recommendation adopted,* 2018 WL 4169108 (S.D.W. Va. Aug. 30, 2018) (recommending remand where the ALJ "left the court to guess" how the ALJ arrived at the conclusion that the claimant would be off task for 15 percent of the workday).

The Commissioner distinguishes *Carter, supra*, arguing that the ALJ's analysis of the evidence provided a "clear, logical bridge" to his conclusion that Claimant was less limited than she alleged, but more limited than the state agency consultant concluded. (ECF No. 13 at 13). However, while the ALJ perhaps provided some modicum of support for his conclusion that Claimant's ability to remain on task fell somewhere between her allegations and the consultant's assessment of no mental RFC limitations, the Court would merely be speculating as to the ALJ's basis for his specific finding that Claimant would be off task no more than five percent of the workday. The ALJ's statement that he did not find Claimant's allegations to be fully credible, even when combined with his decision to give partial weight to the opinion evidence, in no way explains how the ALJ arrived at the precise five percent figure. The assessed limitation may very well be appropriate in Claimant's case, but the Court cannot meaningfully review the ALJ's decision without knowing its basis and the evidence supporting it.

In this matter, given the conflicting evidence regarding Claimant's ability to maintain concentration, persistence, or pace and the impact of the off-task limitation on Claimant's ability to return to her past relevant work, the undersigned cannot conclude

that the ALJ's error was harmless. The ALJ determined that Claimant had moderate limitation in maintaining concentration, persistence, or pace, but nonetheless found that she would be off task no more than five percent of the workday. The vocational expert testified that while a five percent off task limitation would be permissible, a person with moderate limitations in the functional domain of concentration, persistence, or pace could not perform Claimant's past work. Clearly, the off-task limitation directly impacted the ALJ's decision that Claimant could return to her past work; consequently, the ALJ was obligated to sufficiently explain the basis for his assessment in this functional domain. *See, e.g., Fisher*, 2018 WL 3348858, at *3 (stating that an explanation of how the ALJ determined the percentage of time that the claimant would be off task was significant because a relatively small increase could preclude competitive employment).

Therefore, because the ALJ's RFC discussion lacks sufficient analysis and explanation for the ALJ's conclusion that Claimant would be off task for no more than five percent of the workday and the undersigned cannot conclude that the ALJ's error was harmless, the undersigned **FINDS** that the Commissioner's decision is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reconsider or elaborate on the off task limitation in Claimant's RFC.

### B.    *Frequent Interaction Limitation*

In her second challenge to the Commissioner's decision, Claimant argues that the ALJ failed to account in the RFC finding for his assessment that Claimant had moderate difficulty interacting with others. Claimant contends that the ALJ's ultimate determination that Claimant could interact with others frequently (up to two-thirds of

23

the workday) was inconsistent with the ALJ's finding that Claimant was moderately limited in that functional domain, and the ALJ did not explain why stricter limitations were not appropriate. Claimant contends that the ALJ's error was not harmless because her capacity to interact with others affected her ability to return to her past work; if she could not return to her past work, she would have been deemed disabled under Medical-Vocational Rule 202.06 due to her age, education, and RFC.

At step two of the evaluation, the ALJ noted Claimant's reports that she did not participate in social activities, did not like to deal with the public, and experienced anger outbursts, but pointed out that Claimant visited others every week and had no problems getting along with family, friends, neighbors, and authority figures. (Tr. at 21). The ALJ further stated that although Claimant's "treatment records document some conflicts" her psychological healthcare provider recorded that Claimant was friendly. (*Id.*). Nevertheless, the ALJ disagreed with the state agency consultant's assessment that Claimant's social functioning was only mildly impaired, and the ALJ found Claimant to be moderately limited in interacting with others. (Tr. at 21-22).

In assessing Claimant's RFC, the ALJ again cited Claimant's statements that she did not like to deal with the public and had explosive outbursts. (Tr. at 23). However, the ALJ did not find Claimant's allegations to be entirely consistent with the evidence. (Tr. at 22, 24). Specifically, the ALJ stated that Claimant had no problems with personal care, prepared meals four times per week, did small loads of laundry, performed light cleaning, shopped in stores weekly, completed yard work, did crafts, practiced yoga, took care of neighborhood cats, and cut wood, and took care of her elderly, infirmed parents. (*Id.*). The ALJ gave only some weight to the state agency psychologist's opinion that Claimant could complete a normal workday and workweek with no mental limitations,

24

stating that "the record (including the hearing testimony discussing the claimant's work record) better support[ed] a finding that" Claimant was limited to frequent interaction with supervisors, co-workers, and the public. (Tr. at 26).

Like the off-task limitation, the ALJ failed to explain the basis for his assessment that Claimant could frequently interact with supervisors, co-workers, and the public. The ALJ cited daily activities ,which did not appear to have any connection to Claimant's ability to interact with people in the workplace, and there was certainly no explanation for the ALJ's specific conclusion that Claimant could interact with others frequently. The ALJ did not give full weight to either Claimant's allegations or the only opinion in the record concerning Claimant's ability to interact with supervisors, co-workers, or the public such that the basis for the ALJ's finding can be reasonably ascertained from the record. Furthermore, to the extent that the ALJ generally referenced Claimant's hearing testimony as supporting his conclusions, the ALJ did not cite or reference any specific statements supporting the finding that Claimant could frequently interact with supervisors, co-workers, and the public. (Tr. at 26). The court cannot parse through the record in order to perhaps find support for the ALJ's decision. In addition, the ALJ's error cannot be considered harmless because the ALJ's conclusion that Claimant could frequently interact with supervisors, co-workers, and the public undoubtedly impacted the ALJ's step four determination that Claimant could return to her past relevant work as a loan processor and administrative assistant.

Therefore, because the ALJ's RFC discussion lacks sufficient analysis and explanation for the ALJ's conclusion that Claimant could frequently interact with supervisors, co-workers, and the public, and the undersigned cannot conclude that the ALJ's error was harmless, the undersigned **FINDS** that the Commissioner's decision is

not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may additionally reconsider or elaborate on the RFC assessment that Claimant can frequently interact with supervisors, co-workers, and the public.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 12), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above

shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 25, 2019

Cheryl A. Eifert
United States Magistrate Judge